THIS ORDER IS APPROVED.

Dated: September 1, 2021

Brenda Moody Whinery, Chief Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>NEAL LEBARON JONES and AMY MELISSA JONES,<br><br>Debtor. | Chapter 7 Proceeding<br><br>Case No. 4:15-bk-00508-BMW |
| RUCHIR PATEL,<br><br>Plaintiff,<br><br>v.<br><br>NEAL LEBARON JONES,<br><br>Defendant. | Adversary Case No. 4:15-ap-00283-BMW<br><br>**MEMORANDUM DECISION** |

Before the Court is the *Amended Adversary Complaint to Preclude the Discharge of Certain Debts and to Deny Any Discharge to Debtor* (the "Amended Complaint") (DE 10)[1] filed by Dr. Ruchir Patel ("Dr. Patel"), in which Dr. Patel asks the Court to find that certain debt owed to him by Dr. Neal LeBaron Jones ("Dr. Jones") is nondischargeable pursuant to

---

[1] References to filings on the docket in this adversary proceeding are indicated by "DE __." References to exhibits admitted into evidence are indicated by "TE __." If an exhibit admitted into evidence is also a filing on the adversary docket, the Court will refer to the document using its docket entry number.

§§ 523(a)(2)(A),[2] 523(a)(4), and/or 523(a)(6).[3]

The Court held a trial on the issues raised in the Amended Complaint and related pleadings on April 27, 2021 and April 28, 2021, at which time the parties presented evidence, and testimony was provided by Dr. Patel, Dr. Jones, and Michael Squires ("Mr. Squires"). On May 28, 2021, the parties submitted post-trial briefs, and the Court took this matter under advisement.

Based on the pleadings, arguments of counsel, testimony offered, exhibits admitted into evidence, and entire record before the Court, the Court now issues its ruling.

## I. Jurisdiction

The Court has jurisdiction over these proceedings, which arise under the Bankruptcy Code. 28 U.S.C. § 1334(b); *In re Wilshire Courtyard*, 729 F.3d 1279, 1285 (9th Cir. 2013). This is a core proceeding to determine the dischargeability of debt over which this Court has jurisdiction to enter final orders and/or judgments. 28 U.S.C. § 157. The parties have consented to this Court's jurisdiction and authority to enter final orders and/or judgments in this case. (4/28/2021 Trial Tr. 70:5-9; DE 31; DE 171 at 2). The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7052.

## II. Factual and Procedural Background

This nondischargeability action was commenced on May 18, 2015. The debt underlying this action is a claim for unpaid wages owed by Dr. Jones and his entity to Dr. Patel for services rendered by Dr. Patel under the terms of an *Associate Agreement* (the "Agreement") (TE 1).

The parties entered into the Agreement on or about January 27, 2011, for a two-year term commencing on July 1, 2011, and concluding on June 30, 2013. (DE 171 at 2, ¶¶ 3 & 5; TE 1). Dr. Jones signed the Agreement in his capacity as president of what was then Neal Jones, D.D.S., M.S., P.C., an Illinois Corporation, but which was later renamed Sauk Valley Orthodontics P.C. (hereinafter, "SVO").[4] (DE 171 at 2-3, ¶¶ 3 & 7). Pursuant to the terms of the Agreement, Dr.

---

[2] Unless otherwise indicated, statutory references are to the Bankruptcy Code, Title 11 of the United States Code.

[3] The Amended Complaint also includes claims brought pursuant to § 727(a) and claims against Amy Jones, which claims the Court previously dismissed. (DE 39).

[4] Dr. Jones and/or Dr. Jones and his wife were, at all times relevant to this action, the sole shareholders

Patel agreed to provide orthodontic services in return for monthly compensation of $18,000, which was to be paid within fifteen days of the end of each prior month. (DE 171 at 2, ¶¶ 3 & 6; TE 1 at 2). This was Dr. Patel's first job as an orthodontist after completing his residency. (Patel Decl. ¶ 5).[5]

In July 2011, around the time Dr. Patel's employment term began, Dr. Jones relocated to Arizona and began providing dentistry services under newly created Arizona entities Desert Vista Orthodontics LLC and Desert Vista Orthodontics Associates, LLC ("DVOA"). (4/28/2021 Trial Tr. 75:5-78:13, 119:9-13; *see* TE 55 at 39, 50). For most of the employment term, Dr. Patel was the sole orthodontist at SVO. (DE 171 at 3, ¶ 8).

Pursuant to the Agreement, Dr. Patel agreed to provide "orthodontic services" for SVO, which services were not further defined in the Agreement. (*See* TE 1). Dr. Patel testified, which testimony was not controverted, that he was only responsible for patient treatment. (Patel Decl. ¶ 7). There is no dispute that the services Dr. Patel agreed to provide did not include billing or collecting accounts receivable, and that his base compensation was not conditioned, or in any way dependent upon, the collection of accounts receivable or SVO's cash flow. (Patel Decl. ¶ 6-10; *see* TE 1). Dr. Patel also testified that his duties at SVO did not include new patient generation, or any management responsibilities, nor did he have access to SVO's financial books and records. (Patel Decl. ¶¶ 7, 9, 10, 12, 17). This testimony was also not successfully controverted. (*See* 4/28/2021 Trial Tr. 38:20-41:10).

During the pertinent timeframe, Mr. Squires provided tax, bookkeeping, accounting, and consulting services for SVO. (4/27/2021 Trial Tr. 11:8-12:5). Moreover, Mr. Squires confirmed during testimony that he also played a management role in SVO, "handl[ing] a good deal of the accounting and management responsibilities for the office from a distance." (4/27/2021 Trial Tr. 30:17-31:1; TE 35 at 80; *see also* 4/27/2021 Trial Tr. 20:9-22). Mr. Squires was generally the "first point of contact for nonclinical matters," and acted at the direction of Dr. Jones. (4/27/2021 Trial Tr. 31:2-32:13; TE 35 at 87).

---

of SVO, and Dr. Jones exercised total control over the entity. (*See* TE 171 at 10, ¶ 48).
[5] "Patel Decl." refers to the portions of the *Declaration of Dr. Ruchir Patel* (DE 178) that were admitted at trial in lieu of Dr. Patel's direct testimony.

Mr. Squires testified that before, during, and after Dr. Patel's employment term, SVO had issues collecting its accounts receivable. (*E.g.*, 4/27/2021 Trial Tr. 28:11-29:1, 35:21-36:21, 116:24-117:2; *see also* TE 34 at 135; TE 85 at 8 & 14). Mr. Squires further testified that there was a steady decline in the cash income that was received by SVO during Dr. Patel's employment term. (4/27/2021 Trial Tr. 119:5-11). Dr. Patel testified that to his knowledge, there was no decline in the number of patients being treated during his period of employment. (4/28/2021 Trial Tr. 7:16-8:19).

In November 2012, SVO fell behind on making the contractual monthly payments to Dr. Patel. (DE 171 at 3, ¶ 9). In Dr. Jones's own words, Dr. Patel began "begging" to be paid. (4/28/2021 Trial Tr. 158:3-6; *see also* Patel Decl. ¶ 34).

In January 2013, Dr. Jones instructed Mr. Squires to withhold payment to Dr. Patel, and to instead pay down a line of credit and pay certain credit card debts. (TE 34 at 23; 4/27/2021 Trial Tr. 41:11-42:17). In January 2013, Dr. Patel was paid some, but not all, of the back wages that were due and owing to him. (TE 23).

In February 2013, during discussions pertaining to renewal of the Agreement, Mr. Squires asked Dr. Patel if he would be opposed to his compensation being tied to revenue. (TE 37 at 99). Dr. Patel responded that he would not agree to a revenue-based compensation structure. (TE 37 at 99). Shortly thereafter, on or around March 1, 2013, Dr. Patel gave notice that he would not automatically renew the Agreement. (Patel Decl. ¶ 19; *see* TE 37 at 97).

At least as of March 21, 2013, Dr. Jones understood Dr. Patel to be "trapped into playing along," in other words, trapped into working for SVO for late, reduced, and/or no payment in the hopes of eventually receiving back pay. (*See* TE 34 at 18). In late March 2013, Dr. Jones communicated a series of directives to Mr. Squires (collectively, the "March 2013 Directives") (TE 34 at 17-19).

First, in a March 21, 2013 email to Mr. Squires, Dr. Jones directed as follows:

> [S]ummary: continue to not pay his full monthly salary; without communicating this to him, pay him relative to collections; we can select some figure that allows us to keep paying everyone else, grow a reserve, and stay afloat; don't budge on position; when Ruchir is motivated to be paid more (including to get his back pay)

> he'll help the office do better; pay Ruchir less, not more until things get better; ensure creditors are paid, but not Ruchir; Ruchir will likely change his attitude and behavior (major source of SVO's problems) when he gets less pay, not more . . . .

(TE 34 at 18-19).

In an email sent one minute later, Dr. Jones told Mr. Squires:

> You must be paid, I must be paid, the girls [i.e. the office staff] must be paid, the suppliers must be paid, and the creditors must be paid.

(TE 34 at 18).

Then, eight days later, Dr. Jones stated as follows:

> I've learned that Ruchir unless has to fear something (generates motivation) or he'll continue being apathetic.
> . . . .

(TE 34 at 17).

Mr. Squires testified that he assumed he followed the above instructions from Dr. Jones. (4/27/2021 Trial Tr. 43:18-44:25, 45:14-24). Consistent with the above directives, all payments made to Dr. Patel during his employment period after the above directives were not timely made, and in most cases, were only partial payments. (*See* TE 23). Further, no one ever communicated to Dr. Patel that he would not be paid pursuant to the terms of the Agreement, but instead based on collections of accounts receivable, or at Dr. Jones's whim. (Patel Decl. ¶ 33; 4/27/2021 Trial Tr. 44:23-25, 45:18-24).

On or about June 3, 2013, Mr. Squires asked Dr. Patel to schedule patients for a period of time after expiration of the Agreement. (Patel Decl. ¶ 21a). In response, Dr. Patel sought reimbursement of costs and payment of overdue wages. (TE 37 at 170). Mr. Squires told Dr. Patel that SVO was unable to fulfill his request at that time, but that SVO intended to pay Dr. Patel the entire amount he was owed within a matter of months. (TE 37 at 170).

Dr. Patel testified that on or about June 6, 2013, he checked production and collections data stored on SVO's software program. (Patel Decl. ¶ 15). Based upon such review, Dr. Patel emailed Mr. Squires inquiring as to a bonus, which Dr. Patel believed he was entitled to under the terms of the Agreement. (Patel Decl. ¶ 15; 4/28/2021 Trial Tr. 66:5-13; TE 37 at 172; *see* TE

1 at § 4(b)). Shortly thereafter, Dr. Patel's ability to access collections data on the practice software was disabled. (Patel Decl. ¶ 15; 4/28/2021 Trial Tr. 39:6-40:23, 63:1-13, 66:5-17).

After expiration of the Agreement, SVO again asked Dr. Patel to continue providing services until they could hire an orthodontist to replace him, and Dr. Patel continued to perform such services with the promise of repayment. (*See* TE 32; Patel Decl. ¶¶ 19, 26).

Dr. Patel's last day at SVO was September 5, 2013. (Patel Decl. ¶ 26). No party has disputed that Dr. Patel worked the complete term of the Agreement and fulfilled all terms of the Agreement.

Informal repayment negotiations were unsuccessful, and pursuant to the terms of the Agreement, the parties mediated the issue of back wages. (DE 171 at 3, ¶ 10). As a result of the mediation, SVO prepared a payment schedule (the "Repayment Schedule") (TE 25), which provided for repayment of the total amount due to Dr. Patel in 18 monthly payments of $3,250 beginning on September 15, 2013. (DE 171 at 3, ¶¶ 10-11). The Repayment Schedule was confirmed and agreed to on behalf of SVO by Dr. Jones in a series of emails between Dr. Jones, Dr. Patel, and Mr. Squires ("the Repayment Agreement") (TE 32). (*See also* DE 171 at 3, ¶ 12).

SVO made the September and October 2013 payments due under the Repayment Agreement, but then payments stopped. (DE 171 at 3, ¶ 13; TE 23).

On December 18, 2013, Dr. Jones told Dr. Patel that SVO production had slowed, and that because of the lack of cash in SVO, SVO was unable to pay Dr. Patel pursuant to the Repayment Agreement, but would instead pay him smaller monthly amounts, and eventually repay him in full. (TE 82). However, no further payments were ever made to Dr. Patel. (DE 171 at 3, ¶ 13; TE 23). The balance due to Dr. Patel was $52,000. (DE 171 at 3, ¶ 14).

In years 2011 through 2013, all employees and independent contractors of SVO were paid in full except for Dr. Patel. (DE 171 at 11, ¶ 56). Further, during Dr. Patel's period of employment, Dr. Jones received distributions and loans from SVO and made contributions to his retirement accounts. (DE 171 at 11-12, ¶¶ 57-60; 4/27/2021 Trial Tr. 54:15-55:5; 4/28/2021 Trial Tr. 88:6-13, 159:6-160:1; TE 20; TE 26). Dr. Jones admitted that even though he had relocated to Arizona, and was no longer performing services in Illinois, he effectively received a monthly

salary from SVO for "orthodontic services." Between August 2011 and July 2013, Dr. Jones directed the transfer of $80,688.95 from SVO to his entity, DVOA, which entity then transferred funds to or for the benefit of Dr. Jones and/or his family. (TE 20; 4/28/2021 Trial Tr. 88:6-13, 99:7-102:25, 159:6-160:1). During this time, SVO also paid the mortgage on Dr. Jones's personal vacation timeshare, which amount totaled approximately $8,012.00. (TE 145; 4/27/2021 Trial Tr. 73:4-7). SVO accounted for such payments as "rent" in its account records. (TE 145; *see also* 4/27/2021 Trial Tr. 73:4-7).

At the end of years 2011, 2012, and 2013, SVO had cash on hand in the amounts of $37,572.80, $29,216.26, and $21,013.40, respectively, as well as other retained earnings. (TE 26; 4/27/2021 Trial Tr. 54:2-14, 59:18-60:4). There was also in excess of $32,000 owing from Dr. Jones to SVO at the end of 2013. (TE 26; 4/27/2021 Trial Tr. 54:15-55:5).

The dispute over Dr. Patel's unpaid wages proceeded to arbitration on April 16, 2014, against both SVO and Dr. Jones. (DE 171 at 4, ¶ 19). On May 12, 2014, the arbitrator entered an award in favor of Dr. Patel and against Dr. Jones and SVO, jointly and severally, in the amount of $68,455 (the "Arbitration Award") (TE 4). (DE 171 at 4, ¶¶ 20-21). In the Arbitration Award, the arbitrator found Dr. Jones and SVO jointly and severally liable to Dr. Patel under the Illinois Wage Payment Act, 820 ILCS § 115/1 (the "Wage Payment Act").[6] (TE 4). In addition to the payment of back wages in the amount of $52,000, the arbitrator found that Dr. Patel was entitled to interest in the amount of $11,055, and attorneys' fees in the amount of $5,400. (TE 4 at 7).

---

[6] The arbitrator found in part as follows:

> While the Agreement does not explicitly state whether the relationship was one of "employer-employee," the testimony and documents reflect that Dr. Patel was an employee rather than an independent contractor. Although SVO did not withhold FICA or other payroll taxes, Dr. Patel was subject to the control and direction of SVO and Dr. Jones throughout the two-year term of his contract[.]
> . . . .
> Based on the evidence, Dr. Patel has established all the elements necessary to establish joint and several liability under the Wage Payment Act: SVO and Dr. Jones are "employers" within the meaning of the statute; there was an employment contract or agreement, and Dr. Patel meets the definition of a "separated employee" due final compensation.

(TE 4 at 6).

Dr. Jones and SVO failed to pay the Arbitration Award. (DE 171 at 7, ¶ 26). Accordingly, on August 19, 2014, Dr. Patel filed a petition to confirm the Arbitration Award and for entry of judgment, and on October 21, 2014, the Circuit Court of Cook County, Illinois entered an order confirming the Arbitration Award and entering judgment against Dr. Jones and SVO in the amount of $73,254 (the "Illinois Judgment") (TE 8). (DE 171 at 7-8, ¶¶ 26-30). The parties agree that the Illinois Judgment is a final judgment entitled to full faith and credit. (DE 171 at 8, ¶ 31).

On the same date the Illinois Judgment was entered, Dr. Jones informed Mr. Squires of the Illinois Judgment and informed him that Dr. Patel would be able to reach assets if and when he could locate them, commenting that it would likely take Dr. Patel time to collect from bank accounts in Arizona. (TE 37 at 393). In the same email, Dr. Jones instructed Mr. Squires to dismiss most of SVO's employees, keep operating expenses to a minimum, and pay all possible payroll taxes from the SVO accounts. (TE 37 at 393). Shortly thereafter, SVO "closed its doors." (DE 171 at 8, ¶ 32).

Mr. Squires testified that the demise of SVO was attributable to Dr. Jones's relocation to Arizona, as well as the downturn in the economy and issues relating to the collection of accounts receivable. (4/27/2021 Trial Tr. 32:14-33:5, 116:20-117:5, 126:10-18; TE 35 at 425).

On January 20, 2015, Dr. Jones and his wife filed a petition for relief under chapter 7 of the Bankruptcy Code (the "Bankruptcy Case").[7] Thereafter, Dr. Patel timely commenced this adversary action.

The Amended Complaint alleges in pertinent part that:

(1) The services Dr. Patel rendered were obtained by false pretenses, false representations, and/or actual fraud, and that pursuant to § 523(a)(2)(A), Dr. Jones is not entitled to a discharge of the debt owed to Dr. Patel;

(2) The services Dr. Patel rendered were obtained by fraud while acting in a fiduciary capacity, and that pursuant to § 523(a)(4), Dr. Jones is not entitled to a discharge of the debt owed to Dr. Patel; and/or

---

[7] *In re Jones*, No. 4:15-bk-00508-BMW (Bankr. D. Ariz. 2015).

(3) Dr. Jones willfully and maliciously injured Dr. Patel and Dr. Patel's property, and that, pursuant to § 523(a)(6), Dr. Jones is not entitled to a discharge of the debt owed to Dr. Patel. (DE 10 at 2).

Dr. Patel asks the Court to enter a nondischargeable judgment against Dr. Jones in the amount of the Illinois Judgment, plus statutory interest and attorneys' fees.

It is Dr. Jones's position that this is a simple breach of contract action attributable to financial distress, such that the debt at issue is dischargeable.

### III. Legal Analysis & Conclusions of Law

In light of the "fresh start" policy underlying the Bankruptcy Code, "exceptions to discharge 'should be confined to those plainly expressed.'" *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (quoting *Gleason v. Thaw,* 236 U.S. 558, 562 (1915)). That being said, the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (quoting in part *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

### A. The Section 523(a)(6) Claim

Pursuant to § 523(a)(6), "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt - for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"

"[A]lthough § 523(a)(6) generally applies to torts rather than to contracts and an intentional breach of contract generally will not give rise to a nondischargeable debt, where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6)." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1205 (9th Cir. 2001) (emphasis omitted). In order to determine whether a breach of contract renders debt nondischargeable under § 523(a)(6), the Ninth Circuit has employed a two-part test: first, a court must determine whether the debtor's conduct was tortious under state law, then the court must determine whether the debtor's conduct was also both willful and malicious. *Lockerby v. Sierra*, 535 F.3d 1038, 1040-41 (9th Cir. 2008) (expanding upon *Jercich*).

### 1. Tortious Conduct Element

The parties agree that the Court must look to Illinois law to determine whether Dr. Jones's conduct was tortious. (Dkt. 171 at 13, ¶ 1). Dr. Patel argues that Dr. Jones committed tortious interference with a contract, namely the Agreement. Dr. Jones disputes that he intentionally interfered with the Agreement, inducing a breach thereof.[8]

Under Illinois law, it is generally recognized that that the elements of the tort of intentional interference with a contract are:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989) (quoting *Prudential Ins. Co. v. Van Matre*, 511 N.E.2d 740, 744 (Ill. Ct. App. 1987)).[9]

Dr. Jones concedes that Dr. Patel has established elements (1), (2), and (5) of his tortious interference claim.[10] (*See* DE 171 at 13). The contested elements of Dr. Patel's tortious

---

[8] Dr. Jones also suggests in his post-trial brief that Dr. Patel is precluded from raising tort claims in this adversary proceeding because he did not raise tort claims during the pre-petition litigation between the parties. However, nondischargeability claims are independent federal claims. By asserting a tortious interference claim in this proceeding, Dr. Patel is not seeking to raise issues which the parties had incentive to litigate during the pre-petition litigation, he is simply attempting to obtain a ruling that the obligation evidenced by the Illinois Judgment is non-dischargeable. *See Archer v. Warner*, 538 U.S. 314, 321 (2003) (noting in the context of § 523(a)(2) that "Congress . . . intended to allow the relevant determination (whether a debt arises out of fraud) to take place in bankruptcy court, not to force it to occur earlier in state court at a time when nondischargeability concerns 'are not directly in issue and neither party has a full incentive to litigate them'"); *In re Sasson*, 424 F.3d 864, 873 (9th Cir. 2005) (discussing the role of preclusion doctrines in nondischargeability proceedings).

[9] The Court notes that Illinois law recognizes a conditional privilege for corporate officers, under which corporate officers "may interfere with a contract where they use business judgment to act on behalf of their corporation[,]" provided that the corporate officer's actions are in the best interests of the corporation, and provided the reason for the interference is not either to further the corporate officer's personal goals or to injure a party to the contract. *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018). Dr. Jones has not expressly asserted the corporate officer privilege. Further, even if the privilege had been properly raised, as discussed in this Memorandum Decision, the purpose of Dr. Jones's interference with the Agreement was to further his personal goals and to injure Dr. Patel, and as such, cannot be said to have been in the best interests of SVO. Any privilege that Dr. Jones may have had, therefore, cannot stand to shield him from liability in this matter.

[10] Further, based upon the testimony, evidence, and record before the Court, the Court finds that Dr. Patel

interference claim are whether Dr. Jones intentionally and unjustifiably induced SVO to breach the Agreement, and whether there was a subsequent breach of the Agreement caused by the wrongful conduct of Dr. Jones.

### a. Intentional and Unjustifiable Inducement to Breach Agreement

"Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *Kawaauhau*, 523 U.S. at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)) (emphasis omitted). Additionally, "[e]stablishing inducement, in the context of a claim for tortious interference with a contract, 'requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.'" *In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ct. App. Ill. 1995) (quoting M. Polelle & B. Ottley, *Illinois Tort Law*, at 334 (1985)). With respect to whether an inducement is justifiable, "[d]irectors and officers are not justified in acting solely for their own benefit or solely in order to injure the plaintiff because such conduct is contrary to the best interests of the corporation." *Stafford v. Puro*, 63 F.3d 1436, 1442 (7th Cir. 1995) (applying Illinois law).

In this case, it is clear from the written communications between Dr. Jones and Mr. Squires that Dr. Jones intended to induce SVO to breach the Agreement. Dr. Jones expressly and unambiguously instructed Mr. Squires, acting on behalf of SVO, to withhold wages to Dr. Patel, which wages Dr. Jones knew were due and owing under the Agreement.

Further, Dr. Jones's intentional inducement was unjustifiable given that Dr. Jones induced SVO to breach the Agreement for the primary purpose of causing injury to Dr. Patel. In the March 2013 Directives, Dr. Jones explicitly directed Mr. Squires to withhold wages from Dr. Patel, while continuing to pay the other debts of SVO, in order to cause financial injury to Dr. Patel, whereby generating "fear" and/or "motivation." Although Dr. Jones suggests that his conduct was justified because it was guided by his business judgment and was dictated by the inability of SVO to make the agreed-upon payments to Dr. Patel, Dr. Jones's actions were contrary to the best interests of SVO, and any alleged inability of SVO to pay Dr. Patel pursuant to the

---

has met his burden of establishing that the Agreement was a valid and enforceable contract between himself and SVO, that Dr. Jones was aware of the contractual relationship, and that there are damages. Thus, elements (1), (2), and (5) of Dr. Patel's tortious interference claim are satisfied.

Agreement is unpersuasive. During the period of time during which SVO was, at Dr. Jones's direction, withholding Dr. Patel's wages, Dr. Jones was withdrawing funds from SVO for his own benefit, including in the form of distributions and loans, and directing SVO to pay costs related to such things as his personal vacation timeshare.

Based upon the foregoing, and the entire record in this case, it is the determination of this Court that Dr. Jones intentionally and unjustifiably induced SVO to breach the Agreement.

### b. Breach Caused by Wrongful Conduct

The record reflects that SVO breached the Agreement as a direct result of Dr. Jones's wrongful conduct. Mr. Squires, who was the person responsible for issuing payments to Dr. Patel on behalf of SVO, was instructed by Dr. Jones not to pay Dr. Patel according to the Agreement, and as a direct result, Mr. Squires did not remit payments to Dr. Patel. Breach and causation are clear.

Given the foregoing, Dr. Patel has established that Dr. Jones engaged in tortious conduct under applicable Illinois law, and the first element of Dr. Patel's § 523(a)(6) claim is therefore satisfied.

### 2. Willful Element

In the Ninth Circuit, "the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct." *Jercich*, 238 F.3d at 1208. In this case, the record reflects that Dr. Jones had *both* a subjective motive to injure Dr. Patel and that Dr. Jones believed that the injury Dr. Patel sustained was substantially certain to occur as a result of his conduct. There is no dispute that all other employees and independent contractors of SVO were paid in full during Dr. Patel's employment term, and the extensive communications from Dr. Jones to Mr. Squires that were admitted into evidence, and in particular the March 2013 Directives, reveal a deliberate and malicious pattern of conduct aimed at inflicting willful injury upon and causing economic distress to Dr. Patel. Dr. Jones took steps to "trap" Dr. Patel into continuing to perform services for SVO without being paid pursuant to the terms of the Agreement, all the while continuing to siphon funds out of SVO for his personal benefit. Further,

subjective motive aside, Dr. Jones knew that SVO owed wages to Dr. Patel, Dr. Jones deliberately directed the withholding of such wages, and Dr. Jones knew that injury to Dr. Patel was substantially certain to occur as result.

Based upon the foregoing, it is the determination of the Court that the willful element of § 523(a)(6) is satisfied.

### 3. Malicious Element

"A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which causes injury, and (4) is done without just cause or excuse.'" *Jercich*, 238 F.3d at 1209 (quoting *In re Bammer*, 131 F.3d 788, 791 (9th Cir. 1997)). As the Court has already determined, Dr. Jones intentionally engaged in wrongful conduct by intentionally inducing SVO to repeatedly breach the terms of the Agreement, Dr. Jones's conduct was unjustified, and Dr. Jones's wrongful conduct caused injury to Dr. Patel.

Given the foregoing, and the entire record before the Court, it is this Court's determination that Dr. Jones acted with malice. Accordingly, Dr. Patel has established all elements of his § 523(a)(6) claim. The Court, therefore, need not determine whether the debt at issue is also nondischargeable pursuant to § 523(a)(2)(A) or § 523(a)(4).

### B. The Requests for Attorneys' Fees and Pre-Judgment Interest

Although Dr. Patel seeks an award of "any due interest and attorney fees" in his post-trial brief, Dr. Patel's requests for pre-judgment interest and attorneys' fees[11] have not, at this time, been properly brought before the Court.

## IV. Conclusion

Dr. Jones did not merely direct SVO to breach the Agreement. The record overwhelmingly reflects that Dr. Jones willfully and intentionally acted with targeted malice and tortiously interfered with the Agreement, resulting in damages to Dr. Patel. As a result, it is the

///

///

---

[11] *See* Fed. R. Bankr. P. 7054(b)(2) (incorporating in part Fed. R. Civ. P. 54(d)(2)).

determination of this Court that pursuant to § 523(a)(6) of the Bankruptcy Code, the debt owing to Dr. Patel, as set forth in the Illinois Judgment, is nondischargeable as to Dr. Jones.

A judgment will issue contemporaneously with this Memorandum Decision.

**DATED AND SIGNED ABOVE.**